JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, Paul Posen, appeals the trial court's granting the motions of defendants,[1] The Albert M. Higley Company ("Higley"), OccuCenters, Inc. ("OccuCenters"), and Sitecon, LLC. ("Sitecon") for summary judgment.
 {¶ 2} In January 2000, The Northeast Ohio Regional Sewer District-Westerly Waste Water Treatment Plant ("NORSD") solicited construction bids for work to be done at its water treatment facility. Much of the work involved the containment and/or removal of lead from the site. Higley was selected as the general construction contractor for the project. Higley subcontracted the welding, demolition and excavation work to Sitecon. Plaintiff worked for Sitecon at the NORSD project.
 {¶ 3} Before beginning work, however, plaintiff was required to submit to a pre-employment physical examination to verify that he was fit to work at the site known to be contaminated with lead. During the examination, OccuCenters took a written and oral history from plaintiff. OccuCenters learned that plaintiff had a history of asthma and had smoked two packs of cigarettes per day for more than 30 years.
 {¶ 4} Approximately two months into the project, in or about June, plaintiff began experiencing numbness and he was referred back to OccuCenters for additional blood tests. Plaintiff's blood testing was confined to detecting abnormal lead levels. His test results came back within normal limits, and he returned to work.
 {¶ 5} In October 2000, plaintiff was hospitalized at Meridia for gastrointestinal bleeding and incidentally diagnosed with polycythemia, signaled by an abnormally high level of red blood cells. Two months later, plaintiff underwent bronchial washings and was diagnosed with aspergillosis fumigatus, a fungal infection of the lung.
 {¶ 6} In February 2001, plaintiff was hospitalized at Meridia for pneumonia and a lung mass, but a repeat of the bronchial washings tested negative for aspergillosis or any other fungal infection.
 {¶ 7} Plaintiff filed suit against defendants. Plaintiff's claims against OccuCenters included fraud, conspiracy to commit fraud, gross negligence, and intentional infliction of emotional harm. Plaintiff sued Sitecon for intentional tort. Plaintiff also sued Higley for negligence and gross negligence.
 {¶ 8} Each of the defendants filed motions for summary judgment in which they argued that they had no liability for plaintiff's medical conditions. The trial court agreed and granted each of the motions for summary judgment. This timely appeal followed, in which plaintiff presents the following assignments of error.
OccuCenters
I. THE LOWER COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE OccuCenters, INC.
 {¶ 9} In his Brief in Opposition to Defendants' Motions for Summary Judgment, plaintiff makes only one argument against OccuCenters. Plaintiff argues that when the trial court denied OccuCenters' first motion for summary judgment,[2] it established the law of the case and it could not thereafter alter that ruling. We disagree.
 {¶ 10} In Cale v. Johnson, (6th Cir. 1988),861 F.2d 943, 947, the court explained the law of the case doctrine as follows:
As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. n8 Law of the case directs a court's discretion, it does not limit the tribunal's power.
* * *
n8 Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.
 {¶ 11} In Stemen v. Shibley (1982), 11 Ohio App.3d 263,465 N.E.2d 460, the court determined that the trial court did not err when, after denying a previous motion for summary judgment, it granted a second motion for summary judgment based on an expanded record.
 {¶ 12} In the case at bar, the trial court's docket shows that after OccuCenters' first motion for summary judgment was denied, OccuCenters filed another motion for summary judgment[3] as to all counts of plaintiff's complaint against it, which included counts IV (Fraud and Conspiracy to Commit Fraud), V (Gross Negligence), and VI (Intentional Infliction of Emotional Harm). The court had never ruled on these issues so they survived the court's first ruling.
 {¶ 13} On April 5, 2005, the trial court granted each of the defendants' motions for summary judgment. This decision included OccuCenters' second motion for summary judgment and its motion for reconsideration of the court's denial of its first motion. Contrary to plaintiff's argument, OccuCenters' second motion for summary judgment was an entirely different motion from its first motion for summary judgment insofar as Counts IV, V and VI were at issue for the first time. In that second motion, OccuCenters also requested reconsideration of the court's previous denial of its first motion for summary judgment as to count II (Negligence) of the complaint. The court treated it as a new motion for summary judgment. That first motion had not included any evidence to support its arguments. OccuCenters' second motion, on the other hand, not only asked for summary judgment on all plaintiff's claims against OccuCenters, but now included the deposition testimony of Dr. Ronald G. Hawes, who explained the relationship between OccuCenters and Sitecon. Presented with evidence to support the request for summary judgment, the trial court could properly make a different ruling on the second motion for summary judgment. We, therefore, reject plaintiff's argument that the law of the case doctrine applies in this case. The court's initial denial of the motion for summary judgment was not a final appealable order. And until a final order was entered, the trial court could reconsider its previous decision. Brown v.FirstEnergy Corp., Summit App. No. 22123, 159 Ohio App.3d 696,2005-Ohio-712, ¶ 8, 825 N.E.2d 206.
 {¶ 14} Because his Brief in Opposition did not offer any other argument or evidence concerning OccuCenters' second motion for summary judgment, plaintiff failed to demonstrate that a genuine issue of material fact remained on any of his claims against OccuCenters. The trial court did not err, therefore, in granting OccuCenters' motion for summary judgment. Accordingly, plaintiff's first assignment of error is overruled.
Sitecon
II. THE LOWER COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE SITECON, LLC.
1. Intentional Tort
 {¶ 15} In his second assignment of error, plaintiff alleges that there remain genuine issues of material fact about whether Sitecon committed an intentional tort[4] against him. In the case at bar, plaintiff makes two different arguments about Sitecon's intentional misconduct towards him. First, plaintiff argues that Sitecon knew about his elevated blood levels, and, had it told him about those levels, he could have sought treatment for polycythemia, which, untreated caused him to develop aspergillosis, the fungal mass in his lungs. Second, plaintiff argues that because Sitecon did not tell him about his condition, he continued to work without the proper respirator in an environment filled with contaminated air.
 {¶ 16} To obtain a summary judgment under Civ.R. 56(C), the moving party must demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of informing the court of the basis of the motion and identifying those portions of the record that support the requested judgment. Zivich v. Mentor Soccer Club,82 Ohio St.3d 367, 369-370, 1998-Ohio-389, 696 N.E.2d 201, citing Dresher v.Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107, 662 N.E.2d 264.
 {¶ 17} If the moving party discharges its initial burden, the party against whom the motion is made then bears a reciprocal burden of specificity to oppose the motion. Id. Summary judgment is appropriate if, after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to that party. Id.
 {¶ 18} After the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Id; Civ.R. 56(E); Dresher v. Burt, supra.
 {¶ 19} "An intentional tort is an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." The Supreme Court of Ohio has specified the following requirements:
"* * * [I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."
Fyffe v. Jeno's (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, citing Section 8(A) of the Restatement of Law 2d Torts, and Section 8 of Prosser Keeton on Torts (5 Ed. 1984). Further, plaintiff must establish that the employer had "actual knowledge of the exact dangers which ultimately caused the injuries." Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169,172, citing Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 112, 522 N.E.2d 489.
 {¶ 20} The Ohio Supreme Court has further explained plaintiff's evidentiary burden:
To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Fyffe, supra, paragraph two of the syllabus.
 {¶ 21} As in any tort case,[5] the plaintiff must also demonstrate that the employer's conduct was the proximate cause of his injuries. As the Fifth Appellate District explained: "It is not sufficient to demonstrate that injury was substantially certain to occur by some act or omission of the employer: the plaintiff must prove a nexus between the act or omission of the employer and her injury. The test set out in * * * Fyffe v.Jeno's, Inc. (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph one of the syllabus, expressly applies only to establish intent for purposes of proving an intentional tort: proving substantial certainty of injury does not prove the entire cause of action." Crum v. Lenkei Bros. Cabinet Co. (Sept. 19, 1994), Knox App. No. 94-CA-6, 1994 Ohio App. LEXIS 4368, *3. Courts continue to require a plaintiff in an intentional tort case to establish the proximate cause of his injuries. See,Haney v. Timken, Stark App. No. 2002CA00310, 2003-Ohio-1701, ¶ 67; Bush v. Anchor Hocking Corp., Fairfield App. No. 96-CA-75, 1997 Ohio App. LEXIS 1100, *6; Adams v. Casey Sales Serv.,
Wood App. No. WD-96-030, 1996 Ohio App. LEXIS 5492, *8-*9;Raines v. Rubbermaid, Inc. (1996), 112 Ohio App.3d 384, 390,678 N.E.2d 988; Schneider v. United States Enrichment Corp.
(S.D. Ohio 2005), 2005 U.S. Dist. LEXIS 19878, *10.
 {¶ 22} To establish a causal link between the employer's intent under Fyffe, as well as his employment at Sitecon, and his lung condition, plaintiff submitted the expert report of Dr. Michael Kelly, M.D., M.P.H. In his expert report, Kelly stated the following:
It is inexcusable that he went so long without receiving treatment for the polycythemia, and it is probable that the additional months of no treatment caused additional medical problems, including the development of the pulmonary Aspergillious. He was totally unfit to be working in HAZMAT settings with this elevated hemoglobin, and the development of the pulmonary infection is one of the many serious or even critical predicted medical problems that could develop with this condition.
* * *
* * * Mr. Posen was more likely than not to have contracted Aspergillious from an environment with high levels of thefungus than a location with low levels of the fungus. Someone with an underlying pulmonary condition, particularly polycythemia, but also with fibrotic disease, is much more likely to develop this condition, and go on to become even more severely ill. (Emphasis added.)
Kelly Expert Report at 4, attached to Plaintiff's Supplemental Brief in Opposition to Defendants' Motions for Summary Judgment.
 {¶ 23} According to Sitecon, plaintiff cannot prove the first element of the Fyffe test because it did not know that plaintiff's work environment constituted a hazardous condition for him. Sitecon argues that plaintiff has failed to present any evidence of ambient fungal contaminants capable of causing plaintiff injury at his work site. We agree.
 {¶ 24} Kelly's report does not go far enough in assisting plaintiff to meet his evidentiary burden under Fyffe, supra. The parties agree that Sitecon, through Katz, obtained plaintiff's blood test results. To satisfy the first element ofFyffe, plaintiff must demonstrate that not only did Sitecon know the meaning of his test results, but it also knew that if a person with "high levels" of elevated hemoglobin/hematocrit were exposed to ambient fungal contaminants, he would become severely ill. Plaintiff must also demonstrate that Sitecon knew that the air in and around plaintiff's work site was contaminated with "high levels of the fungus."
 {¶ 25} Although Kelly's report mentions that plaintiff most likely contracted his fungal infection at work, there is, nonetheless, no direct evidence that plaintiff's work environment was actually contaminated with the fungus.
 {¶ 26} In his report, Dr. Kelly opines that "[e]valuations by the City of Cleveland Department of Public Health evaluations [sic] indicate that SiteCon, was out of compliance with fugitive dust emissions. Likewise, there are notations that much of the site was contaminated with sewer water and the soil eventually required excavation." Kelly Report, at 3. Kelly concludes that "contaminated * * * sewer water combined with the fugitive dust emissions most likely produced high levels of Aspergillious [sic] on the site. Aspergillious [sic] is found in multiple locations * * *."[6] Kelly Report, at 4.
 {¶ 27} There are a number of problems with Kelly's statements and the issue of causation in this case. First, Kelly uses the word "site" more broadly than the evidence allows. Plaintiff has not presented any evidence that he worked in the same area in which the dust emissions were found. The record indicates that the dust emissions were in the "J-K" building at the site. There is no evidence, however, that plaintiff ever worked in that building.
 {¶ 28} Because the doctor's conclusions also rely on the assumption that the site was actually contaminated with high levels of the fungal agents that allegedly caused his illness,[7] plaintiff must present competent evidence of that contamination. Kelly references "notations of contamination" in his report,[8] but he provides no sources for those "notations," nor have we located in the record any such sources referring to contaminations.
 {¶ 29} This missing evidentiary link is also fatal to plaintiff's claim that Sitecon knew about the existence of a dangerous condition within its business operation. Without evidence that Sitecon knew its site was contaminated with fungal agents, plaintiff cannot demonstrate that Sitecon knew with substantial certainty that he would be harmed and that it, nonetheless, required him to work in that dangerous environment. Because plaintiff has not produced evidence that Sitecon knew plaintiff's work environment was dangerously contaminated, his argument about working without the proper respirator in an environment filled with contaminated air, fails.
 {¶ 30} Plaintiff has not presented any evidence that his work environment was contaminated with fungal agents. Absent proof of contamination, the question of whether plaintiff should have had a different respirator is moot.
 {¶ 31} Under Fyffe, plaintiff's claims fail to create a genuine issue of material fact under Civ.R. 56. Accordingly, the trial court did not err in granting Sitecon's motion for summary judgment on plaintiff's intentional tort claim.[9]
 Fraud and Conspiracy
 {¶ 31} Plaintiff further argues that Sitecon committed fraud and conspiracy to commit fraud against him because it did not tell him that he had elevated hemoglobin/hematocrit blood levels. Alternatively, plaintiff claims Sitecon misrepresented his test results to him. Plaintiff relies on the case of Delamotte v.Unitcast Div. Of Midland Ross Corp. (1978), 64 Ohio App.2d 159.
 {¶ 32} In Delamotte, the court determined that plaintiff's employer had required him to submit to medical examinations for a period of more than ten years. During those years, defendant knew that plaintiff suffered from silicosis as a result of his employment. Defendant never told plaintiff about his condition even though his illness grew worse over the years. The court determined that the trial court erred in granting summary judgment in favor of the employer, because plaintiff had presented evidence that defendant fraudulently, maliciously, and willfully conspired not to inform plaintiff about his condition. "Such fraud is a tort of the employer not within the meaning of R.C. 4123.74," which grants immunity. Id. at 161. The Sixth District Court further explained:
certain common-law actions may still be maintained by an employee where the cause of action is predicated upon some wrong or contractual obligation compensation and satisfaction for which is not furnished by the Workmen's Compensation Act, such as an action for false representation.
Another theory and principle of law which supports the conclusion that the summary judgment granted by the trial court here should be reversed is the dual-capacity doctrine, set forth in Guy v. Arthur H. Thomas Co., supra. Pursuant to that theory, the plaintiff as an employee herein is not barred from recovery from his employer in tort where the physical examinations of the employee sponsored by the defendant confer upon the defendant obligations unrelated to and independent of the obligations imposed on the defendant as the employer.
Id. at 164.
 {¶ 33} This "dual capacity doctrine" is further explained inWalter v. Allied Signal, Inc. (1999), 131 Ohio App.3d 253,722 N.E.2d 164:
In order for the dual capacity doctrine to apply, there must be an allegation and showing that the employer occupied two independent and unrelated relationships with the employee, that (at the times of these roles) there were occasioned two different obligations to the employee and that the employer had during such time assumed a role other than that of employer. McGee v.Goodyear Atomic Corp. (1995), 103 Ohio App.3d 236, 247,659 N.E.2d 317, discretionary appeal not allowed, 73 Ohio St.3d 1449,654 N.E.2d 985 (1995).
* * *
An employer may become a third person, amenable to tort suit by an employee under this doctrine, if — and only if — he possesses a second persona so completely independent from, and unrelated to, his status as an employer that by established standards the law recognizes it as a separate legal person.
Id. at 260. The Third District held that the dual capacity exception to employer immunity did not apply merely because the employee consulted the in-plant medical facility.
 {¶ 34} In the case at bar, plaintiff asserts that the dual capacity doctrine applies because Sitecon assumed the independent responsibility for his medical treatment as the employer did inDelamotte. Delamotte, however, is distinquishable from the facts in this case.
 {¶ 35} In Delamotte, the court determined that defendant functioned independently of its role as employer when it decided to function as a medical provider for treatment and then intentionally concealed plaintiff's medical condition from him. Plaintiff was required to submit to periodic physical examinations and x-rays for more than ten years. As a result of those tests, defendant knew plaintiff had contracted silicosis, a disease defendant knew was directly related to its business. Defendant in Delamotte committed an independent harm against plaintiff, therefore, when it intentionally concealed the fact that he had silicosis.
 {¶ 36} In the case at bar, however, OccuCenters was not an in-plant facility and was not Sitecon's employee; it was an independent contractor. During his deposition, Ronald G. Hawes, M.D. described the nature of OccuCenters' relationship with Sitecon:
Q: What type of relationship did you have with Sitecon?
A: Fee for service.
Q: Would you explain to me what fee for service is?
A: SiteCon hired us to do specialized examinations and provide results to them and we did.
Q: Under that type of relationship, when you run across an employee or you examine an employee, do you have a doctor/patient relationship with that employee?
A: No.
Q: Why not?
A: We do not provide treatment. We do not provide medical advice to that patient or to that employee.
Q: Are there any other reasons?
A: Yes.
Q: What are they?
A: We advertise ourselves and hold ourselves out to the public and to all our clients as an occupational medical center. As such, we do not provide primary care medical services to any person. We do not practice the art of medicine, the art or science of medicine as it relates to any disease process unless it's related to work.
Hawes Deposition, at 28-29.
 {¶ 37} OccuCenters had been hired by Sitecon to conduct specialized pre-employment and post-employment physicals to insure that employees were medically fit for work at the NORSD facility. And, even after the initial pre-employment screening, though plaintiff returned for other tests, there is no evidence that those tests were performed for any reason other than to monitor his lead levels, which were always within normal limits. OccuCenters cleared plaintiff for employment at the NORSD facility.
 {¶ 38} Moreover, unlike the plaintiff in Delamotte,
plaintiff here did not have to submit to periodic testing over the span of many years as a condition of his employment.
 {¶ 39} In order for plaintiff to establish that Sitecon fits under the dual capacity doctrine, he must demonstrate that it not only functioned as his employer but it also functioned as the same type of medical provider shown in Delamotte. Plaintiff points to the blood test results Sitecon received from OccuCenters. According to plaintiff, when Sitecon received the results showing elevated hemoglobin and hematocrit levels, it should have informed him so that he could seek such treatment for his polycythemia.
 {¶ 40} The problem with plaintiff's argument is that it presupposes that when Sitecon received his test results, Sitecon knew what the numbers meant.
 {¶ 41} Plaintiff argues further, however, that Sitecon told him that OccuCenters would provide him medical treatment. Plaintiff's Brief on Appeal, 9. During his deposition, plaintiff testified as follows:
Q: You have also alleged that there was some conspiracy between OccuCenters and Sitecon. What was the conspiracy?
A: There was a time during the job where people of managerial position and coworkers were concerned that I didn't look healthy.
At one time Howard Katz, who was the field superintendent, approached me and said, his words were,"I wouldn't do this for anybody, but I like you, Paul, and I would like to send you down to the clinic and get you checked out if you would like."
My answer to him was, "Well, Howard, if you are going to send me down there and just check my lead level and of that nature, I would just as soon go see my own doctor."
He said, "Paul, I wouldn't do this for anybody, but I want you to go, and I'll have the full blood work done on you, they will do whatever I tell them to do."
And I said, "Fine, I will go," and I went after work with the belief that they were going to do a full blood work and report anything suspicious.
Q: And would that have been in August of 2000?
A: I believe so.
Q: Who were you going to see if you didn't go to OccuCenters?
A: I would have seen our family physician if something would have been brought to my attention that there was something wrong.
Q: And that would have been Dr. Ebersbacher, that's who you would have probably gone to see?
A: Probably.
Q: And how is it that you believe OccuCenters was involved in that conspiracy?
A: Again I believe they didn't report the abnormal blood levels, and I don't believe that they did the follow-through with the testing that was supposed to be done.
Q: What is it that causes you to believe that OccuCenters knew that there was supposed to be more than a lead test done?
A: I was told by a representative of Sitecon that that's what he was going to tell them to do.
Q: And do you believe that was told to OccuCenters and they just didn't do it?
A: That's my belief.
Q: And what causes you to believe that?
A: I can't really answer that.
Q: Sitecon was going to pay for it, correct?
A: Correct.
Q: Can you think of any motive that OccuCenters would have for not performing additional tests which they would have made more money for had they been asked to do them?
A: No, I can't.
Q: Do you know of any reason why OccuCenters would have a reason to not do requested medical tests on you?
A: I can't really speculate.
Q: Was there any problems [sic] that you ever had at OccuCenters that you would think they would be that vindictive?
A: I had no problems at OccuCenters.
Q: Do you truly believe that it was an intentional act?
MR. KENNEY: Objection. Go ahead.
A: I don't know what to believe.
Q: Do you believe that OccuCenters and Sitecon talked about this and agreed to do this?
A: I don't know.
Q: Do you have any evidence if they did?
MR. KENNEY: Objection.
Q: You can answer.
MR. KENNEY: If you know, go ahead.
A: No, I don't.
Tr. 87-91.
 {¶ 42} There is no reference here to treatment or diagnosis. From this record, we are unable to conclude that plaintiff ever had a reasonable basis to believe that OccuCenters would conduct itself in any way different from how it acted in the past, that is, simply as a facility to test lead levels in his blood.
 {¶ 43} Plaintiff admits that he has no evidence that anyone at Sitecon directed OccuCenters to conduct the testing he describes. We further underscore the absence of any evidence from Katz or OccuCenters on this issue. Plaintiff never even deposed Katz. Accordingly, plaintiff's "belief" that OccuCenters was going to conduct full bloodwork testing on him was based on a vague conversation with Mr. Katz. In plaintiff's recounting of his conversation with Mr. Katz at no point does anyone clarify what "full bloodwork" means. There are a range of possible meanings.
 {¶ 44} As the record stands, OccuCenters was not a medical treatment or even a diagnostic facility and there is no evidence that Sitecon ever used it as such a facility with regard to plaintiff or any other employee. Without such evidence, we conclude that the "dual capacity" doctrine does not apply in this case because there is no evidence that Sitecon assumed a role other than that of plaintiff's employer.
 {¶ 45} We also find no merit to plaintiff's fraud and conspiracy to commit fraud[10] claims. An action in fraud has five essential elements: 1) a material false representation or a concealment, 2) knowingly made or concealed, 3) with the intent of misleading another into relying upon it, 4) justifiable reliance upon the representation or concealment by the party claiming injury, and 5) injury resulting from the reliance.Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55,514 N.E.2d 709.
 {¶ 46} In the case at bar, to prove the first element of his fraud claim, plaintiff must demonstrate that Sitecon knew he had polycythemia or understood risks attendant to elevated red blood cells and it intentionally concealed that information from him. From the record before this court, however, there is no evidence that Sitecon understood what elevated hemoglobin/hematocrit blood levels meant for plaintiff. To the contrary, there is evidence of just the opposite, namely that plaintiff had elevated blood levels as far back as 1998.
 {¶ 47} In May 1998, plaintiff went to the emergency room at Meridia hospital complaining of chest palpitations. Routine blood tests were taken. At the time, plaintiff's hemoglobin was "19.9" and his hematocrit was "57.0." Plaintiff returned to Meridia in March 2000, one month before he submitted to the pre-employment testing at OccuCenters. Plaintiff's blood was tested again. His hemoglobin was "18.9" while his hematocrit measured "54.6[.]" In April 2000, when OccuCenters tested plaintiff, his hemoglobin was "19.5" and his hematocrit was "58.2[.]"
 {¶ 48} From this record, we conclude that almost a full two years before he was tested by OccuCenters, plaintiff was tested at a hospital and on both occasions, he tested consistently beyond the normal ranges. Although we may not speculate about what plaintiff knew or should have known about his blood levels in 1998 or March 2000, we can conclude, however, that if Meridia, a treatment center, did not diagnose polycythemia and advise him, why would Sitecon be expected to go any further than Meridia?
 {¶ 49} Because plaintiff's blood levels were outside the normal range in both 1998 and March 2000, we reject his claim that had Sitecon told him he had elevated levels in April 2000 he would have sought treatment. Plaintiff is attempting to bootstrap a duty and, therefore, a standard of care onto Sitecon without ever establishing that it had knowledge of any risks attendant to his elevated levels and assented to a duty reserved almost exclusively for medical treatment facilities.
 {¶ 50} Even if Sitecon knew what polycythemia was and knew that plaintiff had it and that it is made worse by fungal agents in plaintiff's work environment, there still is no evidence that the air within plaintiff's work area was contaminated. Without such evidence, plaintiff cannot show that the physical environment at Sitecon proximately caused him any injury.
 {¶ 51} Plaintiff's claim for conspiracy to commit fraud also fails. In Ohio, a civil conspiracy requires the following: (1) a malicious combination (2) of two or more persons, (3) injury to person or property, and (4) the existence of an unlawful act independent from the actual conspiracy. Universal Coach, Inc. v.New York City Transit Authority, Inc. (1993),90 Ohio App.3d 284, 292, 629 N.E.2d 28, citing Minarik v. Nagy (1963),8 Ohio App.2d 194, 26 O.O.2d 359, 193 N.E.2d 280.
 {¶ 52} In the case at bar, we have already determined that Sitecon did not commit an intentional tort against plaintiff. We have also concluded that Sitecon did not proximately cause plaintiff any injury from any fraudulent concealment. Accordingly, Sitecon has not committed any unlawful act against plaintiff. As such, plaintiff's conspiracy to commit fraud claim fails as a matter of law.
 {¶ 53} Plaintiff also argues that Sitecon committed the tort of intentional infliction of emotional distress[11] against him. A claim for intentional infliction of emotional distress must present the following elements:
" * * * 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it can be considered as `utterly intolerable in a civilized community,' Restatement of Torts 2d (1965) 73, Section 46, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that `no reasonable man could be expected to endure it,' Restatement of Torts 2d 77, Section 46, comment j." Pyle v. Pyle (1983),11 Ohio App.3d 31, 34, 11 Ohio B. Rep. 63, 66, 463 N.E.2d 98, 103.
 Junke v. Friedman, Cuyahoga App. No. 69883, 1996 Ohio App. LEXIS 5826, at *19, citing Ashcroft v. Mt. Sinai Medical Ctr.
(1990), 68 Ohio App.3d 359, 366, 588 N.E.2d 280.
 {¶ 54} In the case at bar, plaintiff argues that he suffered emotional distress because Sitecon did not tell him he had polycythemia and it did not protect him from contracting asperigillosis. This is the same argument plaintiff presented under the "dual capacity" doctrine. As we concluded there, plaintiff has not established that Sitecon had any basis for understanding what elevated hemoglobin/hematocrit levels meant.
 {¶ 55} Further, there is no evidence that plaintiff's work environment was contaminated with aspergillus and, therefore, dangerous. Accordingly, plaintiff cannot demonstrate that Sitecon's conduct was unlawful and, therefore, he cannot show that it proximately caused any injury to him, psychic or otherwise.
 {¶ 56} Finally, though plaintiff did not argue his remaining claims against Sitecon in his brief in opposition in the trial court, we, nonetheless, conclude that he cannot prove these claims either. Plaintiff alleges that Sitecon committed negligence[12] and gross negligence[13] against him. In Ohio, to establish a negligence claim, plaintiffs must establish that a duty was owed them, that the duty was breached, and that the breach proximately caused their injuries. SeeChambers v. St. Mary's School (1998), 82 Ohio St.3d 563, 565,697 N.E.2d 198, 200.
 {¶ 57} In the case at bar, plaintiff's negligence claim against Sitecon fails. As with the failure of his other claims, plaintiff has not established the proximate cause of his injuries, that is, the necessary nexus between his injuries and his employer. Without evidence of that nexus, plaintiff cannot prevail on a negligence claim against Sitecon.
 {¶ 58} The same result applies with plaintiff's claim of gross negligence against all the defendants. "Gross negligence" is defined as the "failure to exercise any or very slight care" or "a failure to exercise even that care which a careless person would use." Thompson Electric, Inc. v. Bank One, Akron, N.A.
(1988), 37 Ohio St.3d 259, 265. Evidence of proximate cause is required. Breeds v. McKinney (1960), 171 Ohio St. 336,170 N.E.2d 850.
 {¶ 59} In the case at bar, we have already determined that plaintiff has failed to demonstrate that high levels of aspergillus were present in the area where he worked. Without some proof by way of expert testimony or expert testing that the plaintiff's work site at NORSD was contaminated with aspergillus, plaintiff's claim for gross negligence fails as well.
 {¶ 60} For the foregoing reasons, plaintiff's second assignment of error fails. His third assignment follows:
III. THE LOWER COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/APPELLEE THE ALFRED M. HIGLEY COMPANY.
 {¶ 61} Plaintiff argues that Higley, the general contractor, owed him a duty of care because plaintiff was engaged in inherently dangerous work. We disagree.
 {¶ 62} As stated in Cafferkey v. Turner Const. Co. (1986),21 Ohio St.3d 110, 488 N.E.2d 189:
A general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work.
Id. at syllabus. The court explained the term "active participation" as follows:
"One who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor."
Id. at 112, quoting Hirschbach v. Cincinnati Gas Elec. Co.
(1983), 6 Ohio St.3d 206, at syllabus.
 {¶ 63} In the case at bar, Higley does not dispute that the NORSD site was inherently dangerous because of the presence of lead. Plaintiff's expert, however, stated the presence of substantial fungal contaminants, not the presence of lead in his work area, was the proximate cause of his injuries. Throughout his brief, plaintiff argues that he had polycythemia which, because it went untreated, led to aspergillosis. Dr. Kelly claimed plaintiff developed aspergillosis because he was forced to work in an environment that contained ambient fungal agents, not lead. Plaintiff's expert, Dr. Kelly, however, does not connect lead to aspergillosis.
 {¶ 64} Further, we do not find evidence that plaintiff's work environment was contaminated with fungal agents at all, let alone in a number sufficient to cause aspergillosis.
 {¶ 65} It is not enough for Dr. Kelly to opine that "Aspergillous [sic] is found in multiple locations * * *." Plaintiff must demonstrate a causal link between his work environment and his illness. Without such evidence, plaintiff cannot show that his work environment was the proximate cause of his injuries. Because plaintiff did not provide evidence establishing this link, the trial court did not err in granting Higley's motion for summary judgment. Therefore, plaintiff's claim against Higley for gross negligence fails.
 {¶ 66} Accordingly, plaintiff's third assignment of error fails.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sean C. Gallagher, J., concurs with Separate ConcurringOpinion.
 Colleen Conway Cooney, P.J., concurs in judgment only.
[1] Plaintiff also originally named The Northeast Ohio Regional Sewer District-Westerly Waste Water Treatment Plant as a defendant. The Northeast Ohio Regional Sewer District agreed to a settlement and was dismissed by plaintiff; it is not, therefore, a party to this appeal.
[2] Filed July 16, 2003.
[3] This motion was filed on June 4, 2004.
[4] Count I of plaintiff's complaint.
[5] Avon Lake City School Dist. v. Ohio Dept. of Taxation
(1989), 55 Ohio App.3d 171, 172, 563 N.E.2d 754, citing Prosser 
Keeton, Law of Torts (5 Ed. 1984) 164-165, Section 30.
[6] "Aspergillus" is the fungus; "aspergillosis" is the disease.
[7] Dr. Kelly cites "soil contaminated by sewer water combined with the fugitive dust emissions" as the source "most likely" of "Aspergillious" [sic] on the site. However, elsewhere Dr. Kelly explains that he contracted "Aspergillosis from an environment with high levels of the fungus * * *."
[8] This exhibit is the only one attached to plaintiff's response to the motion for summary judgment.
[9] At the end of its motion for summary judgment, Sitecon stated that not only was it not liable for an intentional tort claim against it, the company's actions could not be the proximate cause of any of plaintiff's other claimed injuries.
[10] Count IV of plaintiff's complaint.
[11] Count VI of plaintiff's complaint.
[12] Count III of plaintiff's complaint.
[13] Count V of plaintiff's complaint.