HELFINSTINE et al., Appellants,

v.

PLASTICOLORS, Appellee.

[Cite as *Helfinstine v. Plasticolors*, 182 Ohio App.3d 430, 2009-Ohio-2442.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2008–A–0065.

Decided May 22, 2009.

432

Paul W. Flowers Co., L.P.A., and Paul W. Flowers; and Bashein & Bashein Co., L.P.A., and W. Craig Bashein, for appellants.

Law Offices of Katherine S. Riedel Co., L.P.A. and William E. Riedel, for appellee.

TIMOTHY P. CANNON, Judge.

{¶ 1} Appellants, Steve C. and Karen Helfinstine, appeal from the decision of the Ashtabula County Court of Common Pleas granting summary judgment to appellee, Plasticolors.[1] For the following reasons, we affirm the judgment of the trial court.

{¶ 2} Appellant Steve Helfinstine commenced his employment as a part-time employee of appellee Plasticolors in 1996. Helfinstine began working full time at Plasticolors in 1997. Plasticolors is in the business of producing different color pigments for use by other manufacturers and businesses.

{¶ 3} Upon joining Plasticolors, Helfinstine participated in a two-day orientation program, which included instruction on hazardous-material identification and Plasticolors's safety rules and policies.

{¶ 4} Through ongoing training, Helfinstine eventually achieved the position of Class B1 Production Operator, qualified to work in the following production areas: packaging, potwash, the mix room, and the blend area.

{¶ 5} In March 2003, Plasticolors produced a liquid inhibitor, IN–90315, comprised of P–Bezoquinine, Styrene, and M. Pyrol. IN–90315 was produced in small quantities over a limited period of time; in fact, between September 2002 and January 2005, only 29 batches were produced. IN–90315 was formulated in a 600–gallon pot and then transferred into a 55–gallon drum for shipment.

{¶ 6} On March 31, 2003, Helfinstine had been assigned to operate a machine that filled small bags with 155 grams of colorant that was shipped to a customer, Sika. In performing the Sika operation, Helfinstine was not required to wear any

---

1. We note that Helfinstine incorrectly named appellee as "Plasticolor" in the complaint. Further, throughout the record, the parties intermittently refer to appellee as Plasticolor or Plasticolors. For purposes of this opinion, we refer to appellee by its correct name, "Plasticolors."

special clothing, with the exception of work shoes. On that date, Helfinstine was wearing steel-toed shoes, which were similar to a tennis shoe, made of nylon, low cut, and tied on the top. Helfinstine wore cotton socks.

{¶ 7} During his shift, Helfinstine's manager, Marlin Haas, requested that Helfinstine leave the Sika operation and begin packaging IN–90315. Helfinstine complied.

{¶ 8} As part of the packaging process, Plasticolors provided a packaging sheet for each product containing detailed information as to how the production operator was to proceed. The packaging sheet for IN–90315 indicated that personal protective equipment was to be worn from the head to the ankles. Furthermore, the packaging sheet indicated that IN–90315 was toxic.

{¶ 9} Helfinstine put on a Tyvek pair of coveralls, which extended from his neck to his ankles, two sets of gloves, and a respirator hood. As per the packaging sheet, Helfinstine's gloves were taped to his arms, and the ends of his Tyvek suit were taped to his ankles. The Tyvek suit did not cover an area approximately three to four inches above the top of Helfinstine's work shoes.

{¶ 10} Helfinstine was required to fill up four 55–gallon drums with IN–90315, utilizing the gravity-flow method. While Helfinstine had used the gravity-flow method before, he had never used it with IN–90315. Nevertheless, he was instructed to perform the task.

{¶ 11} The gravity-flow packaging consisted of hooking a pot filled with 50 to 600 gallons of the inhibitor to a hoist crane and positioning it over the drum that was to be filled. The pot had a valve at the bottom. The worker would then pour the contents of the pot through the filter and funnel into a drum, which was sitting on a scale. Once the weight of the drum reached 500 pounds, Helfinstine would cease pouring the liquid. This process included the use of a 64–ounce sol-u-pak tub, which collected any excess product. Once the sol-u-pak tub was filled, the contents were discarded.

{¶ 12} Upon filling the third drum, Helfinstine inadvertently kicked the sol-u-pak tub, which was half to three-quarters full, spilling IN–90315 onto the floor. With the help of another employee, Helfinstine cleaned the spill and completed filling the drums.

{¶ 13} On break, Helfinstine noticed that his sock had turned brown from the liquid spill. He removed his socks, threw them away, and cleaned his work shoes. Since all of the drums were filled, Helfinstine returned to the Sika job after break. Upon completion of his shift, Helfinstine showered and washed both feet. He did not fill out an incident report that day.

{¶ 14} The next morning, Helfinstine observed that his foot was red in the toe and ankle areas; however, he returned to work. Helfinstine then told his superiors about the incident.

{¶ 15} When he returned, his work shoe was still damp from the sol-u-pak incident. However, he continued to work wearing the work shoe until April 11, 2003, at which time he discarded them. By then, the condition of his foot had worsened; the redness had travelled up his left foot, and was blistering. Helfinstine's right foot was also red in color.

{¶ 16} On April 11, 2003, Helfinstine spoke with Plasticolors's quality manager regarding the events of March 31 and, consequently, filled out an incident report. Haas also prepared an incident report.

{¶ 17} Upon observing Helfinstine's foot, the quality manager instructed him to seek medical care. Two days later, on April 13, 2003, Helfinstine went to the emergency room and sought medical treatment for his foot, as the blistering and redness were travelling farther up his leg. On April 14, 2003, Helfinstine went to the medical provider for Plasticolors, who instructed him to stay off work for two weeks.

{¶ 18} Helfinstine continued to work at Plasticolors until September 2003. He successfully established a workers' compensation claim, which was permitted for "contact dermatitis."

{¶ 19} On February 25, 2005, Helfinstine filed suit claiming employer intentional tort, alleging that Plasticolors required him to package IN–90315 without proper equipment, protective wear, technical information, or training. Additionally, he claimed that his exposure to IN–90315 resulted in renal failure, heart attack, significant joint pain, connective tissue disease, neurological deficits, neuropsychological condition, nausea, diarrhea, and high blood pressure.

{¶ 20} After the parties engaged in extensive discovery, including the depositions of the parties, Plasticolors filed a motion for summary judgment, which was opposed by Helfinstine. In a judgment entry dated September 12, 2008, the trial court concluded that Plasticolors was entitled to judgment as a matter of law with respect to the workplace intentional-tort claim.

{¶ 21} It is from this judgment that Helfinstine filed a timely notice of appeal and asserts the following assignment of error:

{¶ 22} "The trial judge erred, as a matter of law, by granting summary judgment in favor of defendant-appellee notwithstanding the existence of genuine issues of material fact upon plaintiff-appellants' workplace intentional tort claim."

{¶ 23} In order for a motion for summary judgment to be granted, the moving party must prove the following:

{¶ 24} "(1) [N]o genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." (Citation omitted.) *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197.

{¶ 25} Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact * * *." Civ.R. 56(C). Material facts are those that might affect the outcome of the suit under the governing law of the case. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123, quoting *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

{¶ 26} If the moving party meets this burden, the nonmoving party must then provide evidence illustrating a genuine issue of material fact, pursuant to Civ.R. 56(E). *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Civ.R. 56(E) provides:

{¶ 27} "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."

{¶ 28} Summary judgment is appropriate pursuant to Civ.R. 56(E) if the nonmoving party does not meet this burden.

{¶ 29} Appellate courts review a trial court's grant of summary judgment de novo. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. "*De novo* review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland Bd. of Edn.* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023, citing *Dupler v. Mansfield Journal* (1980), 64 Ohio St.2d 116, 119–120, 18 O.O.3d 354, 413 N.E.2d 1187.

**Helfinstine's Intentional Tort Claim**

{¶ 30} If an employee is injured in the course of employment, his redress typically is limited through the Ohio Workers' Compensation Act, R.C. 4123.01 et seq. However, the Workers' Compensation Act contains certain limited excep-

tions, one of which exists for injuries resulting from an employer's intentional tort upon an employee.

{¶ 31} The Supreme Court of Ohio, in *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, held that "knowledge and appreciation of a risk—something short of substantial certainty—is not intent." Id. at paragraph six of the syllabus. The court further held, in light of the exclusivity of the workers' compensation system, that the threshold for establishing employer intentional tort is very high:

{¶ 32} "There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort' * * *." Id. at 117, 522 N.E.2d 489.

{¶ 33} We analyze Helfinstine's employer intentional-tort claim under the common law standard set forth in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108.

{¶ 34} In *Fyffe,* the Supreme Court of Ohio announced the test for an employer intentional tort as follows:

{¶ 35} "[I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such, knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus.

{¶ 36} The elements as set forth under *Fyffe* are conjunctive, and a plaintiff must establish a genuine issue of material fact regarding all three prongs of the test to avoid summary judgment. *Fleming v. AAS Serv., Inc.,* 177 Ohio App.3d 778, 2008-Ohio-3908, 896 N.E.2d 175, at ¶ 62.

{¶ 37} To establish an intentional tort by an employer, an employee must demonstrate proof beyond that required to prove negligence or recklessness. *Fyffe v. Jeno's, Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph two of the syllabus. " 'If a plaintiff can show that harm or consequences will follow

the risk, that the employer knows that injuries to employees are certain or substantially certain to result from the risk, and yet the employer still requires the employee to proceed, the employer is treated by law as if he had in fact desired the end result.' " (Citation omitted.) *Fleming v. AAS Serv., Inc.*, 177 Ohio App.3d 778, 2008-Ohio-3908, 896 N.E.2d 175, at ¶ 55.

{¶ 38} "As in any tort case, the plaintiff must also demonstrate that the employer's conduct was the proximate cause of his injuries. As the Fifth Appellate District explained: 'It is not sufficient to demonstrate that injury was substantially certain to occur by some act or omission of the employer: the plaintiff must prove a nexus between the act or omission of the employer and her injury. The test set out in * * * *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph one of the syllabus, expressly applies only to establish intent for purposes of proving an intentional tort: proving substantial certainty of injury does not prove the entire cause of action.' * * * Courts continue to require a plaintiff in an intentional tort case to establish the proximate cause of his injuries." (Citation omitted.) *Posen v. Sitecon, L.L.C.*, 8th Dist. No. 86239, 2006-Ohio-3167, 2006 WL 1774131, at ¶ 21.

{¶ 39} Helfinstine claims Plasticolors committed an intentional tort by requiring him to work with IN–90315, a toxic and hazardous inhibitor, without requiring protective footwear. Helfinstine maintains that his superiors appreciated the risk of danger associated with exposure to chemicals during the packaging process, as they were required to wear personal protective equipment covering their entire bodies, except their feet. In addition, Helfinstine contends that Plasticolors failed to provide adequate training for employees regarding the safe handling of IN–90315 during a gravity pour.

{¶ 40} Plasticolors argues that Helfinstine cannot meet the first prong of the *Fyffe* standard. First, Plasticolors maintains that its employees, along with Helfinstine, were required to participate in ongoing training programs, which dealt with hazardous-material identification and Plasticolors's safety rules and policies. While dangers are associated with the business of producing and packaging chemicals, those dangers are incidental to the nature of the job. Furthermore, Helfinstine was familiar with the gravity-flow method and had performed it on numerous occasions.

{¶ 41} Helfinstine asserts that Plasticolors's management knew with substantial certainty that injury would occur because the company failed to provide the proper footwear protection. While Plasticolors required steel-toed boots for all employees, it was understood that they were not designed to provide protection against chemical exposure. Helfinstine points out that Plasticolors's management understood that chemicals were being regularly splashed and spilled on the workers during the performance of their job duties. Specifically, a manager

conceded that the employees' feet were the most likely body part to be exposed to any chemical spill.

{¶ 42} Plasticolors contends that Helfinstine failed to satisfy the second element of the *Fyffe* standard. Plasticolors maintains that it had a rigorous program for reporting workplace incidents and at no time prior to March 31, 2003, was an incident reported that an employee claimed injury as a result of a spilled sol-u-pak tub partially filled with any product or inhibitor. Further, a review of incident reports from 1990 to 2003 failed to reveal any claims of accident or injury to its employees similar to that claimed by Helfinstine. In addition, Plasticolors argues that while Helfinstine did not have experience packaging the inhibitor, IN–90315, he had been qualified to work in packaging since 1997. Moreover, the gravity-flow method as used in the instant case was not a new system for packaging, and Helfinstine had, on previous occasions, packaged Plasticolors's products utilizing the gravity-flow method.

{¶ 43} Plasticolors believes that Helfinstine's contention that managers were aware of numerous episodes of employee chemical exposure is misplaced. While a manager testified regarding two spill incidents, they occurred when a filter bag was being changed, a circumstance lacking similarity to the instant situation.

{¶ 44} Finally, Plasticolors argues that Helfinstine cannot satisfy the third element of the *Fyffe* standard because he kicked over the sol-u-pak tub containing the inhibitor, which he had placed on the ground. Plasticolors maintains that Helfinstine could have stored the sol-u-pak tub off the floor, pointing to other available locations.

### Whether Plasticolors Knew of the Existence of Dangerous Conditions

{¶ 45} To establish that Plasticolors committed an intentional tort, the employer, Plasticolors, must have had knowledge "of the existence of a dangerous process, procedure, instrumentality or condition within its business operation." *Fyffe*, 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus. Therefore, Helfinstine must demonstrate there was a dangerous condition and that Plasticolors had knowledge that the dangerous condition existed.

{¶ 46} "The focus of an intentional tort action under the standards set forth in * * * *Van Fossen*, 36 Ohio St.3d 100[, 522 N.E.2d 489], is on the knowledge of the employer regarding the risk of injury. The plaintiff has the burden of proving by a preponderance of the evidence that the employer had '*actual knowledge of the exact dangers which ultimately caused*' injury. *Van Fossen, supra,* at 112[, 522 N.E.2d 489]." (Emphasis added.) *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114.

{¶ 47} Helfinstine claims that Plasticolors's management possessed knowledge of the use of dangerous chemicals in the plant, including IN–90315.

{¶ 48} Certainly, the job in which Helfinstine performed can be reasonably construed as dangerous. As noted by the trial court, "Plasticolors' business operations include the production and packaging of chemicals, all of which could potentially be dangerous, unless certain safety measures are followed." However, this court must not focus upon the nature of the dangerous work, but upon the dangerous condition within such dangerous work.

{¶ 49} The record reveals that Helfinstine had received extensive training in the identification and handling of hazardous material. The employees of Plasticolors participated in ongoing training programs relating to the current and potential hazards of chemicals and personal protection equipment. As correctly stated by the trial court, "[a]lthough Plasticolors knew of some of the dangers inherent in their business, the facts in this case do not rise to the level of showing that Plasticolors necessarily would have believed the packaging process leading to the incident with Helfinstine was dangerous or posed a danger to employees who follow instructions and had adequate training, as in this case."

{¶ 50} In this regard, we disagree with the trial court. The fact that the employer knew that employees should be wearing protective suits, to the point of taping the suit at the wrist and taping it again at the bottom of the suit, is a clear indication of the employer's knowledge of the seriousness of the exposure. The question here is whether the employer knew, or should have known with substantial certainty, that failure to require additional protection for the feet in this scenario created a dangerous condition within the dangerous work. Stated another way, did the employer know that this failure to require additional footwear protection created a dangerous condition? Construing the evidence most strongly in favor of the employee in this instance, we find there to be a question of fact with regard to the first prong of *Fyffe*.

**Whether Plasticolors Knew that Harm Was Substantially Certain to Occur**

{¶ 51} If the trier of fact finds in the affirmative under the first prong, the inquiry must continue. Under the second prong of *Fyffe*, Helfinstine must establish that a factual question exists concerning whether the employer had knowledge that if he was subjected to the dangerous condition, i.e., depriving employees of critical footwear protection, he would, with substantial certainty, sustain harm.

{¶ 52} On appeal, Helfinstine claims that the management of Plasticolors "knew that depriving the operators of critical footwear protection would sooner or later result in an injury or fatality." However, such an argument of foreseeability is not appropriate under the second prong of *Fyffe*, for it is not sufficient that an accident is foreseeable.

{¶ 53} Furthermore, in *Drazetic v. Coe Mfg. Co.*, 11th Dist. No. 2005–L–035, 2006-Ohio-1688, 2006 WL 847224, at ¶ 22, this court held:

{¶ 54} "The absence of prior accidents strongly suggests a lack of knowledge by an employer that injury from a particular procedure or process was substantially certain to occur."

{¶ 55} In the case sub judice, the affidavit of Jeff Craigo, Plasticolors's Director of Human Resources, stated that he had reviewed all workplace incident reports dating from 1990 to March of 2003. The reports reveal no incidents where an employee had previously been injured by spilling the contents of a sol-u-pak tub.

{¶ 56} To support this prong, Helfinstine emphasizes that Plasticolors's managers understood that chemicals were regularly being spilled on workers during performance of their duties, citing the deposition testimony of two managers, Marlin Haas and Todd Pew.

{¶ 57} First, Helfinstine argues that in his deposition, Haas testified that he had inadvertently dripped old inhibitor on his hand and had accidently knocked a pot on his foot.

{¶ 58} A review of the record, however, reveals the following testimony by Haas:

{¶ 59} "Q. * * * What has fallen on your foot?

{¶ 60} "A. A pot. Working in the pot wash years ago, knocked things off the workbench and landed on my foot.

{¶ 61} "Q. Get hurt?

{¶ 62} "A. Bounced off the steel toe."

{¶ 63} It is evident from the above testimony that Haas's foot was not exposed to chemicals; in fact, in this situation cited by Helfinstine, the mandated steel-toed boot protected Haas's foot. In addition, while the record demonstrates that Haas's hand had been exposed to an inhibitor, he testified that he did not have the required protective gloves on at the time.

{¶ 64} Moreover, the testimony of Todd Pew is insufficient to satisfy the second prong of *Fyffe*. Although Pew testified in his deposition that he was aware of two instances in which an employee had been exposed to an inhibitor, the exposure did not occur during the transfer process. Furthermore, the two employees did not suffer any physical injuries, nor did they require medical attention as a result of the inhibitor exposure. See *Youngbird v. Whirlpool Corp.* (1994), 99 Ohio App.3d 740, 747, 651 N.E.2d 1314 (holding that two other accidents were neither similar enough nor close enough in time to be relevant to the conditions present at the time of Youngbird's injury).

{¶ 65} Thus, Helfinstine has not presented any evidence that Plasticolors had "knowledge" that its employees were using a dangerous procedure that was substantially certain to cause injury. *Fyffe*, 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph one of the syllabus. As a result, he has failed to meet the second prong of *Fyffe*.

{¶ 66} Although a genuine issue on the second prong is necessary to find that the third prong of *Fyffe* has been met, we will consider whether Plasticolors required Helfinstine to work in dangerous conditions.

**Whether Plasticolors Required Helfinstine to Work in Dangerous Conditions**

{¶ 67} Under this prong, Plasticolors, with knowledge of a dangerous condition and of a substantial certainty of harm, must have required Helfinstine to perform a dangerous task.

{¶ 68} "In analyzing this element, the Supreme Court has held that an employer need not explicitly require an employee to perform a dangerous task.

{¶ 69} " 'Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the (plaintiff) to engage in that dangerous task.' " *Fleming v. AAS Serv., Inc.*, 177 Ohio App.3d 778, 2008-Ohio-3908, 896 N.E.2d 175, at ¶ 74, quoting *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 487, 696 N.E.2d 1044.

{¶ 70} Helfinstine argues that he was fully compliant with the policies of Plasticolors when he was injured. While Helfinstine acknowledges that his alleged injury occurred when he kicked over the sol-u-pak tub with his left foot, he claims that Plasticolors's managers had experienced similar incidents on previous occasions. To support this argument, he cites the depositions of Haas and Pew. However, based on our previous analysis, this argument is without merit.

{¶ 71} As noted, Heflinstine placed the sol-u-pak tub on the ground; however, other storage locations off the floor were available to him. Helfinstine's exposure to IN–90315 occurred when he kicked over this sol-u-pak tub. Therefore, we hold that there are no genuine issues of material fact as to *Fyffe*'s third element.

**Proximate Cause and Punitive Damages**

{¶ 72} On appeal, Helfinstine maintains that in the context of a summary judgment exercise, he was not required to prove that the accident of March 31, 2003 was the proximate cause of the medical conditions of which he complained. However, based on our holding that Helfinstine has failed to satisfy *Fyffe*, we decline to address the issue of proximate cause.

{¶ 73} We further decline to address Helfinstine's argument that punitive damages should be assessed against Plasticolors. A review of the record reveals that the issue of punitive damages was not raised in Plasticolors's motion for summary judgment. Consequently, the trial court did not consider whether Helfinstine was entitled to an award of punitive damages.

{¶ 74} Furthermore, an award for actual damages is a prerequisite to the award of punitive damages. *Richard v. Hunter* (1949), 151 Ohio St. 185, 187, 39 O.O. 24, 85 N.E.2d 109.

{¶ 75} " 'Before punitive damages may be awarded actual damages must have been found and assessed. It is said that a plaintiff has no right to maintain an action merely for the purpose of inflicting punishment upon another. Many cases applying the rule requiring that actual damages be found as a predicate for the allowance of exemplary damages hold that an award of nominal damages will not serve as a basis for the imposition of exemplary or punitive damages, but such is not the case in Ohio, where it has been held that a verdict for punitive damages requires either nominal or compensatory damages as a predicate.' " *Argrov Box Co. v. Illini Four Co.* (June 15, 1981), 2d Dist. No. CA 6947, 1981 WL 2827, at *2, quoting 16 Ohio Jurisprudence 2d (1974) Damages, Section 155.

{¶ 76} For the reasons stated in the opinion of this court, the assignment of error is without merit. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is hereby affirmed.

Judgment affirmed.

GRENDELL, J., concurs.

TRAPP, P.J., dissents.

TRAPP, Presiding Judge, dissenting.

{¶ 77} While I agree with the majority's analysis as to the first prong of the *Fyffe* test, I respectfully disagree with the conclusions that Helfinstine failed to present *any* evidence that Plasticolors had knowledge that its employees were using a dangerous procedure that was substantially certain to cause injury and that he failed to present *any* evidence that with knowledge of a dangerous condition that was substantially certain to cause harm, the employer required Helfinstine to perform a dangerous task.

{¶ 78} At the outset, it bears repeating that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In addition, it must appear from the evidence and stipulations that reasonable minds can come to only one conclusion, which is

adverse to the nonmoving party. (Citations omitted.) *Welch v. Ziccarelli,* 11th Dist. No. 2006–L–229, 2007-Ohio-4374, 2007 WL 2410102, ¶ 36.

{¶ 79} "Since summary judgment denies the party his or her 'day in court' it is not to be viewed lightly as docket control or as a 'little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In *Dresher v. Burt* [ (1996), 75 Ohio St.3d 280, 662 N.E.2d 264], the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must be in the record or the motion cannot succeed. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112[, 526 N.E.2d 798]." *Welch,* 2007-Ohio-4374, 2007 WL 2410102, at ¶ 40.

{¶ 80} Further, in considering a motion for summary judgment, a court must determine only whether reasonable minds can reach more than one conclusion on the facts. The court must not weigh the evidence or determine the merits of the case or the credibility of the witnesses. *Kreais v. Chemi-Trol Chem. Co.* (1989), 52 Ohio App.3d 74, 78, 557 N.E.2d 155; *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341–342, 617 N.E.2d 1123. The purpose of summary judgment is not to try issues of fact, but to determine whether triable issues of fact exist. *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 659 N.E.2d 317. Not only is it the duty of the court to closely scrutinize the evidence in favor of the movant, but the court must view it, as well as any inferences that may be made from that evidence, in the most favorable light to the opposing party. *Allstate Ins. Co. v. Baileys* (N.D.Ohio 1958), 192 F.Supp. 595, 596. "A summary judgment should not be granted where the facts although not in dispute are subject to conflicting inferences." *Cottrell v. Mayfield* (May 1, 1987), 11th Dist. No. 1730, 1987 WL

10758, citing 73 American Jurisprudence 2d (1974) Summary Judgment, Section 27.

{¶ 81} The majority relies on an inference drawn from the absence of prior accidents such as Helfinstine's in which a tub designed to catch excess product is kicked by an employee, causing some product to spill onto the employee's unprotected feet, to determine that the employer had no "knowledge" that the employees were using a dangerous process substantially certain to cause harm and that the worker was not required to engage in "that" dangerous task sufficient to meet the second and third prongs of *Fyffe*. But the record demonstrates a conflicting inference that may be made sufficient to defeat summary judgment as to the second and third prongs of *Fyffe*.

{¶ 82} Pew, the quality control manager, and Herndon, the production manager, both testified that the pump method was the preferred and safer method of transfer because it offered less risk of exposure than the gravity-feed method. The gravity-feed method necessarily contemplates spillage inasmuch as a tub is used to catch the errant liquid. From the fact that the employer required the worker to tape the protective suit around the gloves and at the ankles, one may infer that the employer was aware that there was danger of both spillage and skin contact in this transfer method. Furthermore, the packing slip for the material noted at "11A7.01," "Corrosive material! Use extreme caution when handling. Avoid skin contact!!!" (The multiple exclamation marks are present on the document.) There was also evidence presented of spillage or inadvertent dripping of other materials in the plant, as well as a prior incident in which a pot had been kicked over. Despite these facts, Helfinstine was required to use this method to transfer the product.

{¶ 83} From all of this evidence, it may be inferred that regardless of the precise mechanism of this spill, the employer certainly had knowledge of the degree of the risk involved in the use of the gravity-feed method using a sol-u-pak tub with no adequate and available foot protection from spills, and that if the employee were subjected to spillage of this dangerous liquid, harm to the employee was a substantial certainty. See *Brown v. Packaging Corp. of Am.* (Jan. 11, 2001), 8th Dist. No. 77709, 2001 WL 30429 (the court held that in "determining whether an employer had knowledge that a dangerous procedure would be substantially certain to cause injury, the focus is not on how many prior accidents had occurred, but rather on the employer's knowledge of the degree of risk involved").

{¶ 84} This is precisely the focus outlined by the Supreme Court of Ohio in *Fyffe*. "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his

conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent." *Fyffe*, 59 Ohio St.3d at 118, 570 N.E.2d 1108.

{¶ 85} It has been observed that the court in *Fyffe* "broadened the scope of the substantial certainty test to include high risk activities classified in all previous cases as only acts of recklessness. * * * Therefore, in deleting the term 'high risk' from the *Van Fossen* test and in asserting that certain 'high risk' activities amount to a substantial certainty that harm will result and thus fall within the scope of intentional torts, the *Fyffe* court suggested that recklessness by an employer may now be enough to constitute an intentional tort." Lisa A. Rutenschroer, The Ohio "Standard" for Workplace Intentional Tort (1992), 61 U.Cin.L.Rev. 331, 360.

{¶ 86} With such a broadened definition of "substantial certainty" and the evidence presented by Helfinstine by way of deposition testimony and other evidentiary materials that must be weighed in order to determine whether an intentional tort claim has been established, summary judgment was not appropriate in this case. Further, if there is evidence to *weigh*, summary judgment is not appropriate as a jury weighs the evidence, not the judge.

{¶ 87} Moreover, it appears that the trial court either ignored the report of the expert, Roger Wabeke, an industrial hygienist, or engaged in a weighing exercise when considering his report. This expert's report speaks to all of the essential issues required to defeat summary judgment under the *Fyffe* test.

{¶ 88} The expert opined that the employer "knew of several dangerous processes, procedures, instrumentalities, and hazardous and toxic conditions within its business operations"; that the employer "knew that if their employees were subjected by their employment to these dangerous processes, procedures, instrumentalities, and conditions, then harm to their employees would be a substantial certainty"; and that "under these circumstances, and with this knowledge, Plasticolor acted to require their employee, Steve Helfinstine, to continue to perform the dangerous tasks and procedures."

{¶ 89} While the trial court may have thought a jury would not have agreed with these opinions at trial, Helfinstine demonstrated through his expert that in viewing the evidence most strongly in favor of Helfinstine, which we are required

to do, there is more than one conclusion that may be reached. Thus, the case must survive summary judgment.